[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 284.]

THE STATE EX REL. PRESSWARE INTERNATIONAL, INC., APPELLANT, *v.*

INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Pressware Internatl., Inc. v. Indus. Comm.*,

**1999-Ohio-265.**]

*Workers' compensation—Alleged violation of specific safety requirement concerning interlock press barrier guard—Industrial Commission abuses its discretion in finding a violation of Ohio Adm.Code 4121:1-5-10(D)(2)(d)(i), when.*

(No. 96-2600—Submitted January 26, 1999—Decided April 7, 1999.)

APPEAL from the Court of Appeals for Franklin County, No. 95APD06-769.

_____

{¶ 1} Appellant, Pressware International, Inc. ("Pressware"), produces paper products. One of the machines at its Columbus plant in 1990 was press No. 107. Press 107 had four variously located stop buttons with adjacent tab-type lockout devices. There was also a main disconnect switch, as well as a safety interlock gate.

{¶ 2} The safety interlock gate was designed to thwart access to the press's cutting dies while the press was operating. This was done by way of a contact point between the gate's frame and a microswitch on the machine. When the gate was opened, the contact would be broken, which, in turn, broke the electrical circuit and stopped the power.

{¶ 3} In the early morning hours of February 19, 1990, Robert Lilly was operating press 107. During his shift, Lilly experienced problems with the press. According to Lilly, the machine kept shutting down, which he attributed to press vibrations. He speculated that the gate was being sufficiently shaken so as to break

contact with the microswitch, causing the machine to stop. After the sixth or seventh interruption, Lilly contacted Pressware's maintenance department.

{¶ 4} A maintenance worker put an adjustment screw on the press in order to create a new contact point. Unknown to anyone at the time, however, the screw was adjusted out too far. As a result, in the course of repeatedly moving the gate in and out to clear jammed paper, the microswitch broke. This, too, was not known until later.

{¶ 5} Shortly before 8:00 a.m., Marjorie A. Sheerin, appellee-claimant, arrived for her shift. Assigned to press 107, she learned that Lilly had experienced problems with the press. At some point thereafter, the press jammed. According to claimant, she hit the stop button, walked to the end of the press, opened the safety gate, and reached in to clear the jam. Before she could remove her left hand, the press unexpectedly cycled, amputating all of her fingers.

{¶ 6} After her workers' compensation claim was allowed, claimant sought additional compensation, alleging that Pressware had violated numerous specific safety requirements ("VSSRs"). A staff hearing officer ("SHO") for appellee Industrial Commission of Ohio found that power disengagement and lockout requirements were not violated, writing:

"The employer did provide four on/off switches located on the press, and additionally, there was a main power switch on the press which could be padlocked if the press needed major repair, adjustment, or cleaning.

" * * *

" * * * In reference to [Ohio Adm.Code] 4121:1-5-10(C)(6)(a)[,] the employer did have a main power disconnect switch on the side of the press which could be padlocked in the off position. Subsection (b) [of the rule] was satisfied because both the main power switch, through the use of a padlock, and the stop buttons, through the use of a tab lockout, were protected against accidental

operation. Subsection (c) [of the rule] was also satisfied in that the motor couldn't restart without activation of the start button."

{¶ 7} The SHO did find, however, a violation of two other specific safety requirements:

"[Ohio Adm.Code] 4121:1-5-10(D)(2)(d)(i):

" 'When used, an interlocked press barrier guard shall be attached to the press frame or bolster plate [and] shall be interlocked with the press clutch control so that the clutch cannot be activated during normal production unless the guard itself, or the hinged or movable sections of the guard are in position to conform to the requirements of Table 4121:1-5-10(D).'

"This rule essentially holds that when the interlocked press barrier guard is opened, the machine will shut down. In this case, a micro switch was used in contact with the safety gate whereby when the gate was opened[,] contact would be lost with the micro switch and the machine would consequently be shut down.

"However, the employer made an adjustment to the micro switch prior to claimant's injury that unfortunately caused the micro switch to malfunction; consequently, the press was not shut down when the gate was opened by the claimant. That's why the press cycled while claimant's hand was inside the press.

"Therefore, it is found that the employer did fail to have a properly operating interlock press barrier guard and the failure of the guard when opened to shut down the press did proximally [*sic*] cause claimant's injury. Consequently a violation of this section is found.

"The employer's arguments regarding the inapplicability of this rule are rejected. Based on a review of the evidence[,] it is determined that unjamming paper was a routine part of the operator's job; therefore, the unjamming of the machine would have to be considered part of the overall operation of the press. Further, because unjamming the press was part of the operator's job, the operator

would necessarily be forced to place his or her hands into the danger zone of the machine.

"Lastly, the prior operator of the press, Mr. Lilly, had reported ongoing problems with the safety guard on his shift; therefore, the employer did have prior knowledge that the guard was not working properly. Consequently, the single nonfunction [*sic*, malfunction] theory under *State ex rel. M.T.D. Products v. Stebbins* [(1975), 43 Ohio St.2d 114, 72 O.O.2d 63, 330 N.E.2d 904] would not apply.

"Lastly, Ohio Adm.Code 4121:1-5-10(E)(1-2) states that:

" '(1) The employer shall furnish and require the use of hand tools for freeing and removing stuck work or scrap pieces from the dies[,] so that no employee need reach into the point of operation for such purposes.

"['](2) The employer shall provide means for handling scrap from roll feed or random length stock operations.'

"The employer did provide tongs and pliers for removing jammed up paper; however, these products were found to be too big and bulky (p. 20 of transcript) to be utilized in unjamming the paper. There is also an investigation report in [the] file that indicated that no tools had been devised which were capable of removing the scrap paper.

"The employer at hearing did bring out the point that the press did have a bar which the claimant could have used to unjam the paper. However, the existence of this bar tool is not found credible. The employer's investigation which was done after the accident did not mention the existence of this tool. Also, the VSSR safety investigation did not reveal the existence of this tool. The claimant testified (p. 33 of transcript) that she was unaware of the existence of this tool and Ms. Phillips, claimant's supervisor, testified (p. 64 of transcript) that she did not recall seeing that particular bar tool on claimant's press. Therefore, it is concluded that such a bar tool was not available for claimant's use at the time of her injury.

4

"Consequently, based on the fact that claimant was not provided with proper tools for unjamming the paper, and [that] the availability of such a tool would have prevented claimant's hand from entering the danger zone, proximate cause is established and a violation of this rule is found."

{¶ 8} Rehearing was denied.

{¶ 9} Pressware filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in assessing VSSRs against it. The court of appeals found "some evidence" in support of the commission's order and denied the writ.

{¶ 10} This cause is now before this court upon an appeal as of right.

_____

*Vorys, Sater, Seymour & Pease* and *Robert E. Tait*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Michael A. Vanderhorst*, Assistant Attorney General, for appellee Industrial Commission.

*Gibson & Robbins-Penniman* and *Corrine S. Carman*, for appellee Marjorie Sheerin.

_____

*Per Curiam.*

{¶ 11} Pressware contests the two violations assessed against it. Upon review, we find that the commission abused its discretion as to Ohio Adm.Code 4121:1-5-10(D)(2)(d)(i) only.

{¶ 12} Ohio Adm.Code 4121:1-5-10(E)(1) provides:

"The employer shall furnish and require the use of hand tools for freeing and removing stuck work or scrap pieces from the dies, so that no employee need reach into the point of operation for such purposes."

{¶ 13} Pressware contends that it provided employees with needle nose pliers and tongs to remove paper jams. Hearing testimony from claimant and Robert Lilly, however, indicated that those tools were too bulky to fit into the cavity

where jams occurred and were not, therefore, functional. "Some evidence" thus supports the commission's determination that these tools did not satisfy the specific safety requirement.

{¶ 14} Pressware also argues that claimant had access to a "bar tool" to clear jams. The commission, however, as sole evaluator of evidentiary weight and credibility, did not find this assertion credible. The commission correctly observed that neither the commission safety investigator nor Pressware's safety investigator mentioned in their reports finding such a tool. Claimant, moreover, denied knowing of such a tool, as did her supervisor, Alice Phillips. This information again provides "some evidence" that the required tools were not provided.

{¶ 15} Pressware last proposes that any arguable violation should be excused by claimant's negligence in sticking her hand into the die-cutting area. This proposition fails. Specific safety requirements are " 'intended to protect employees against their own negligence and folly as well as provide them a safe place to work.' " *State ex rel. Cotterman v. St. Marys Foundry* (1989), 46 Ohio St.3d 42, 47, 544 N.E.2d 887, 892, quoting *State ex rel. U.S. Steel Corp. v. Cook* (1983), 10 Ohio App.3d 183, 186, 10 OBR 254, 257-258, 461 N.E.2d 916, 919. Thus, unless a claimant deliberately circumvented an otherwise complying safety device, *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.* (1988), 37 Ohio St.3d 162, 524 N.E.2d 482, or refused to use employer-provided safety equipment, *Kale v. Indus. Comm.* (May 3, 1984), Franklin App. No. 83AP-968, unreported, 1984 WL 5731, an employee's conduct is not relevant to a VSSR determination. Here, the commission found that claimant was never given appropriate hand tools. It did not, therefore, err in finding that principles of unilateral negligence were inapplicable.

{¶ 16} Ohio Adm.Code 4121:1-5-10(D)(2)(d)(i) provides:

"(D) Safeguarding the point of operation.

"(1) General Requirements

"(a) It shall be the responsibility of the employer to provide and require the usage of 'point of operation guards' or properly applied and adjusted 'point of operation devices' on every operation performed on a mechanical press. (See table 4121:1-5-10(D) to this rule.)

" * * *

"(2) Point of operation guards.

" * * *

"(d) Interlocked press barrier guard.

"(i) When used, an interlocked press barrier guard shall be attached to the press frame or bolster plate and shall be interlocked with the press clutch control so that the clutch cannot be activated during normal production unless the guard itself, or the hinged or movable sections of the guard are in position to conform to the requirements of table 4121:1-5-10(D) to this rule."

{¶ 17} Pressware initially maintains that the specific safety requirements protection applied only to "normal production" work, of which clearing paper jams was not a part. This argument fails.

{¶ 18} The Code of Specific Safety Requirements does not define "normal production," which places its interpretation in the commission's hands. See *State ex rel. Go-Jo Industries v. Indus. Comm.* (1998), 83 Ohio St.3d 529, 700 N.E.2d 1264. Claimant, Lilly, and Phillips all testified that clearing paper jams was the operator's responsibility and was a regular part of the job. This was reinforced by Pressware's own actions in providing tools, albeit unusable ones, for clearing paper jams. The commission did not, therefore, abuse its discretion in finding that this act fell within the course of "normal production." A finding of applicability was accordingly appropriate.

{¶ 19} Having found applicability of the specific safety requirements to this case, we now consider whether Pressware complied with these requirements. An investigation by Pressware subsequent to the injury revealed that the interlock had

broken. Pressware, nevertheless, argues that the malfunction constituted a first-time failure that immunizes it from culpability under *State ex rel. M.T.D. Products, Inc. v. Stebbins* (1975), 43 Ohio St.2d 114, 72 O.O.2d 63, 330 N.E.2d 904. The appellees disagree, reasoning that the problems during Lilly's shift put Pressware on notice that something was wrong with the interlock.

{¶ 20} Pressware responds that notice cannot be imputed, since the defect that Lilly reported was not the same as that which injured claimant. Lilly complained that the press was shutting down when it was supposed to be running, not that it kept running when it was supposed to be shut down. There is no evidence that press 107's shutdown devices had ever failed before, and it is this fact that sustains Pressware's argument.

{¶ 21} In determining that certain other specific safety requirements had *not* been violated, the commission made two relevant findings. First, it found that Pressware did provide four stop buttons and a main power disconnect switch on press 107. Second, it found that the *only* way the press could be restarted after the stop button was pushed was by again hitting the start button.

{¶ 22} This is critical because claimant testified that she did hit the stop button before she proceeded to the gate area and that the press indeed stopped. Thus, if the stop button worked—as Pressware's maintenance superintendent, Dan Lyons, said it did—it did not matter from a mechanical standpoint whether the interlock was broken. It appears that the interlock could not reactivate the press—only the start button could.

{¶ 23} This makes the commission's order internally inconsistent and opens to debate the question of whether the broken interlock was indeed the cause of claimant's injury. More relevant to Pressware's argument is the effect of these findings on the commission's imputation of knowledge to Pressware. If the stop buttons were fully functional, and it appears that they were, there was no reason for Pressware ever to guess that a broken interlock could have reactivated the press.

As such, immunity under *M.T.D., supra*, shields Pressware from a violation of Ohio Adm.Code 4121:1-5-10(D)(2)(d)(i).

{¶ 24} The judgment of the court of appeals is hereby reversed in part and affirmed in part. That portion of the judgment upholding the violation of 4121:1-5-10(D)(2)(d)(i) is reversed. The rest of the judgment is affirmed.

*Judgment reversed in part*
*and affirmed in part.*

MOYER, C.J., F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

RESNICK, J., dissents and would affirm the judgment of the court of appeals.

————————————